FILED

2006 Oct-23 PM 12:10
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ALABAMA
### MIDDLE DIVISION

|  |  |
|---|---|
| M.H. FOX, JENIECE CARROLL, TERESA BROTHERS, ANGELA HATCHETT, SHARON MITCHELL, THOMAS LEE WHITE, AVA JOYNER, JANET GARRETT, WINFRED EARL, PRINCESS BROWN, and PAMELA WOODWORTH, individually and on behalf of all others similarly situated, | COLLECTIVE ACTION<br><br>CASE NO. _____<br><br>COLLECTIVE ACTION COMPLAINT FOR VIOLATIONS OF FAIR LABOR STANDARDS ACT |
| Plaintiffs, | JURY TRIAL DEMANDED |
| vs. | CV-99-TMP-1612-M |
| TYSON FOODS, INC., including all wholly or partially-owned subsidiaries of Tyson Foods, Inc. that are engaged in the business of chicken processing, |  |
| Defendant. |  |

### COLLECTIVE EMPLOYEE ACTION COMPLAINT

### SUMMARY OF COLLECTIVE EMPLOYEE ACTION CLAIMS

1.     Plaintiffs M.H. Fox, Jeniece Carroll, Teresa Brothers, Angela Hatchett, Sharon

Mitchell, Thomas Lee White, Ava Joyner, Janet Garrett, Winfred Earl, Princess Brown, and

Pamela Woodworth (hereinafter collectively referred to as "Plaintiffs") on behalf of themselves

and all others similarly situated, bring this collective action pursuant to the Fair Labor Standards

Act, 29 U.S.C. § 201 *et seq*. ("FLSA"). They seek relief from Defendant Tyson Foods, Inc.,

including all wholly or partially-owned subsidiaries of Tyson Foods, Inc., that are engaged in the

business of chicken processing (collectively, "Tyson"), for violations of Tyson's statutory

obligation to pay overtime for all work in excess of 40 hours per week performed by employees,

covered by the FLSA. Specifically, Tyson has willfully engaged in the practice of inducing, permitting, or requiring its employees to work "off-the-clock," in excess of 40 hours in a work week without recording the time for all work performed or compensating them with appropriate payment for such work.

## JURISDICTION AND VENUE

2.    This Court has jurisdiction of Plaintiffs' claim pursuant to 28 U.S.C. §§ 1331 and 1337, and § 16(b) of the FLSA, 29 U.S.C. §§ 216(b).

3.    Venue is proper in this Court pursuant to 28 U.S.C. 1391(b), because Tyson operates five chicken processing plants in Northern Alabama, one of which is in Albertville, Alabama, and thus conducts business and can be found in the Northern District of Alabama.

## PARTIES

4.    Plaintiffs bring this action on behalf of themselves and all similarly-situated current and former employees of Tyson who have held non-exempt positions at any time since three years prior to the filing of this Complaint and who have not been fully compensated by Tyson for all hours worked ("the proposed class").

5.    Plaintiff M. H. Fox's address is 1191 Thornhill Road, Boaz, Alabama 35956. Plaintiff Fox has worked for Tyson or one of its predecessor companies at a chicken processing plant on Highway 431 in Albertville, Alabama since July 14, 1986, and is a non-exempt employee within the meaning of the FLSA.

6.    Plaintiff Jeniece Carroll's address is 1124 Windmill Road, Boaz, Alabama 35957. Plaintiff Carroll worked for Tyson or one of its predecessor companies at a chicken processing plant on Highway 431 in Albertville, Alabama from May 1990 to June 2, 1999.

7.     Plaintiff Teresa Brothers' mailing address is P.O. Box 167, Horton, Alabama 35980. Plaintiff Brothers has worked for Tyson or one of its predecessor companies at a chicken processing plant on Highway 431 in Albertville, Alabama since September 23, 1996.

8.     Plaintiff Angela Hatchett's address is 1695 LeCroy Drive, Altoona, Alabama 35952. Plaintiff Hatchett has worked for Tyson or one of its predecessor companies at a chicken processing plant on Highway 431 in Albertville, Alabama since 1995.

9.     Plaintiff Sharon Mitchell's address is 608 Second Street South, Cordele, GA 31015. Plaintiff Mitchell worked for Tyson at a chicken processing plant in Vienna, GA from March 1998 to January 1999.

10.     Plaintiff Thomas Lee White resides at 683 West Main Street, Salisbury, Maryland 21801. Plaintiff White has worked for Tyson or one of its predecessor companies at a chicken processing plant in Berlin, Maryland since 1990, and is a non-exempt employee within the meaning of the FLSA.

11.     Plaintiff Ava Joyner resides at 1530 New Highland Church Road, Brandenburg, Kentucky 40108. Plaintiff Joyner has worked for Tyson or one of its predecessor companies at a chicken processing plant in Corydon, Indiana since 1988, and is a non-exempt employee within the meaning of the FLSA.

12.     Plaintiff Janet Garrett resides at 2410 Leroy Road, Hanson, Kentucky 42413. Plaintiff Garrett has worked for Tyson or one of its predecessor companies at a chicken processing plant in Robards, Kentucky since June 1996, and is a non-exempt employee within the meaning of the FLSA.

-3-

13.     Plaintiff Winfred Earl's postal address is P.O. Box 482, Timpson, Texas 75975.

Plaintiff Earl has worked for Tyson or one of its predecessor companies at a chicken processing

plant in Shelby County, Texas since July 31, 1995, and is a non-exempt employee within the

meaning of the FLSA.

14.     Plaintiff Princess Brown resides at 125 Superior Street, Jackson, Mississippi

39203. Plaintiff Brown has worked for Tyson or one of its predecessor companies at a chicken

processing plant in Jackson, Mississippi since June 27, 1985, and is a non-exempt employee

within the meaning of the FLSA.

15.     Plaintiff Pamela Woodworth's postal address is Route 5, P.O. Box 151, Jay,

Oklahoma 74346. Plaintiff Woodworth has worked for Tyson or one of its predecessor

companies at a chicken processing plant in Noel, Missouri since June 1981, and is a non-exempt

employee within the meaning of the FLSA.

16.     Defendant Tyson is a corporation headquartered in Springdale, Arkansas and is

engaged in the business of chicken processing. Tyson maintains approximately 60 chicken

processing factories nationwide, five of which are in Northern Alabama, and its annual sales are

near $8 billion. At all times relevant to this Complaint, Tyson was regularly engaged in

interstate commerce and was an employer within the meaning of the FLSA, 29 U.S.C. §§ 206-

207. Tyson employs approximately 50,000 employees who are not exempt from the provisions

of the FLSA.

-4-

## GENERAL ALLEGATIONS

17.     Plaintiffs are employees at various chicken processing plants owned by Tyson

across the nation. At each of Tyson's plants, the processing operation, general plant conditions,

and wage practices are similar, if not identical.

18.     Chicken processing is labor-intensive, grueling, and often dangerous work. To

prevent the chickens from spoiling, the plants are freezing cold. The floor is often wet and

slippery and many workers are exposed to chemicals and must work with fast-moving

machinery, sharp knives, and other tools.

19.     Plaintiffs and other non-exempt employees at chicken processing plants owned by

Tyson work in various positions or "lines." Each line performs a discrete task in the processing

and preparation of the chickens for shipping for human consumption and other uses worldwide.

Such lines include, but are not limited to:

(a) "Live Hanging," where employees grab the live chickens and hang them by
their feet for processing, while the chickens often scratch, peck, and defecate on
them;

(b) "Slaughter," where employees monitor the slaughter of the chickens by the
machinery, and often have to slit the necks of the chickens, drenching themselves
in blood, if the machine fails to kill them properly;

(c) "Evisceration," where employees scoop and cut the innards out of the
carcasses of the dead birds, using knives and their own hands;

(d) "Giblet Packing," where employees package the internal organs of the
chickens for insertion back into different birds by other workers later down the
assembly line;

(e) "Deboning," where employees extract the bones and other debris out of the
bodies of the chickens;

-5-

(f) "Cut-up," where employees cut and rip the chickens into separate constituent body parts for packaging;

(g) "Packing" and "Labeling," where employees pack and label the chickens for distribution.

20. Regardless of the line on which they work or other positions they hold, Plaintiffs and other members of the proposed class must keep pace with a fast-moving conveyor belt while they use knives, scissors, or their hands to perform their assigned task on the assembly line.

21. Tyson requires Plaintiffs and other members of the proposed class to arrive at work well before the beginning of their scheduled shifts to engage in certain activities for Tyson's benefit which include the donning of required safety and sanitary equipment and gear. In addition, Tyson requires Plaintiffs and other members of the proposed class to continue working through part or all of their unpaid breaks, and to remain at their work stations or at the plant performing activities for the benefit of Tyson after their scheduled shifts end. Plaintiffs and other members of the proposed class are not compensated for any of this extra work time.

22. Tyson requires Plaintiffs and other members of the proposed class to wear certain safety and sanitary equipment and gear for their jobs. At all of the Tyson plants, Plaintiffs and other members of the proposed class must wait in line when they arrive at work to obtain from a central supply room safety and sanitary equipment and gear which Tyson requires them to wear. Plaintiffs and other members of the proposed class are not compensated for any of this extra work time.

23. Plaintiffs and other members of the proposed class often must purchase most of their required safety and sanitary equipment and gear from Tyson at their own expense, which Tyson deducts from their paychecks. The specific safety and sanitary equipment and gear that an

-6-

employee is required to wear varies according to the line on which the employee works. Generally, this equipment and gear includes a combination of the following items: smocks or coats, plastic aprons, hard plastic arm guards, plastic sleeve covers, rubber rain suits, safety glasses, ear plugs, rubber gloves, cotton liner gloves, chain or mesh cutting gloves, boots or shoe covers, hard hats or caps, hairnets, beard nets, and face masks.

24.     Tyson requires Plaintiffs and other members of the proposed class to comply with strict work-time schedules. Plaintiffs and other members of the proposed class must report to their assigned work stations, wearing all safety and sanitary equipment and gear, up to 5 minutes before the scheduled start time for their shifts. Plaintiffs and other members of the proposed class must wait at their stations for supervisors to fill any vacancies on the line caused by workers who did not come to work that day, for birds to arrive at the plant for processing, and for the processing assembly line to start. Plaintiffs and other members of the proposed class are not compensated for any of this extra work time.

25.     Plaintiffs and others members of the proposed class are required by Tyson to "punch in" and "punch out" on time clocks at the beginning and end of their work day. However, Tyson does not generally pay employees in accordance with the in and out times recorded for each employee. Instead, Tyson pays most employees according to "line time" which is determined by supervisors based on when certain lines or departments are supposed to be in operation. Line time is thus an artificial construct which does not record all hours actually worked by Tyson employees.

26.     Each day, Plaintiffs and other members of the proposed class are entitled to receive one or two unpaid breaks. Plaintiffs and other members of the proposed class must often

continue to work for substantial portions of their unpaid break periods, and must clean up and remove their safety and sanitary equipment and gear prior to beginning those breaks. Likewise, they must end their unpaid break periods early to don their safety and sanitary equipment and gear and report back to their work station. Consequently, Plaintiffs and other members of the proposed class often receive less than 20 minutes of each unpaid break.

27.     At the end of their shifts, Plaintiffs and other members of the proposed class must often continue working, without compensation, because they are required to remain at their station until a replacement worker arrives, or until all the birds for that shift have been completely processed by their line or department.

28.     After Plaintiffs and other members of the proposed class complete their production work, they must clean and wash their work areas, their clothing and their equipment, remove their safety and sanitary equipment and gear, and deposit or store it in their lockers, the laundry, or the garbage. Plaintiffs and other members of the proposed class are not compensated for this work.

29.     This unlawful conduct by Tyson has been widespread, repeated and consistent at its plants across the country.

30.     Tyson's supervisors know that Tyson employees perform work that is uncompensated. The supervisors observe the employees, and often direct them in, performing work for the benefit of Tyson during time that is not recorded by Tyson. In addition, the supervisors determine which time worked by the employees will be paid by Tyson.

31.     Plaintiffs bring this action against Tyson because Tyson has willfully engaged in a pattern and practice of unlawful conduct by declining to record and pay for all of the time it

-8-

requires or permits its members of the proposed class to work, in violation of the FLSA.

Working uncompensated time commonly is known as working "off-the-clock."

32.     Tyson knew or should have known that its supervisory and management

personnel permit or require Plaintiffs and other members of the proposed class to perform work

which is for the benefit of Tyson, and which is integral to Tyson's chicken processing business,

without appropriate compensation, including time spent waiting in line to obtain or purchase

safety and sanitary equipment and gear, donning, doffing, and cleaning safety and sanitary

equipment and gear, reporting early and waiting at their work stations, working after their shift

has ended, and during their unpaid breaks.

33.     The conduct of Tyson, set forth above, has been willful, in bad faith, and has

caused significant damages to Plaintiffs and other members of the proposed class.

## INDIVIDUAL ALLEGATIONS

### M. H. Fox

34.     Plaintiff M. H. Fox has been employed by Tyson or one of its predecessor

companies since July 14, 1986 and currently works the day shift in the Cut-up Department at a

chicken processing plant owned by Tyson in Albertville, Alabama. As an employee in the Cut-

up Department, Plaintiff Fox cuts and rips the chickens into separate constituent body parts for

packaging.

35.     Plaintiff Fox is required to wear various safety and sanitary equipment and gear

for his position in the Cut-up Department, including a smock, a plastic apron, hair and beard

nets, a "bump cap," ear plugs, cotton liners with rubber outer gloves, and rubber boots. Tyson

requires Plaintiff Fox to obtain some of this equipment from the supply room on a daily basis.

-9-

36.     Before reporting to his work station each day, Plaintiff Fox must wait in line to obtain certain equipment and gear from the supply room, walk to his locker to obtain additional equipment and gear, and then don all his safety and sanitary equipment and gear, all of which typically takes a total of at least 5 minutes. Plaintiff Fox is not compensated for any of these activities which are integral and indispensable to Tyson's chicken processing business and relate to his principal employment duties.

37.     Plaintiff Fox is compensated by Tyson according to "line time," which begins at approximately 6:15 a.m. when his supervisor swipes a separate time card for the Cut-up Department, and ends at 2:45 p.m.

38.     After he has completed his work in the Cut-up Department, Plaintiff Fox cleans up and removes his required safety and sanitary equipment and gear, which typically takes at least 5 minutes. Plaintiff Fox is not compensated for any of these activities which are integral and indispensable to Tyson's chicken processing business and relate to his principal employment duties.

39.     Plaintiff Fox is entitled to one 30-minute unpaid lunch break each day. Plaintiff Fox must clean up and remove his gear before going on his unpaid lunch break and then put his gear back on before returning to work. As a result, Plaintiff Fox receives less than 20 minutes of each unpaid 30-minute break because he performs more than 10 minutes work which is integral and indispensable to Tyson's chicken processing business and relates to his principal employment duties.

40.     Plaintiff Fox's supervisors know he is not compensated for all work performed. Each day, they see him performing integral and indispensable tasks for the benefit of Tyson, they

-10-

determine the times when Plaintiff Fox is compensated for time worked, and get a report each day about the hours Plaintiff Fox has worked on the previous day.

41.     Plaintiff Fox is compensated for approximately 40 hours of work per week.  In total, Plaintiff Fox is denied compensation, either at a regular rate or at an overtime premium, for approximately 40 minutes per day, or approximately three and a half hours worked in excess of 40 hours per work week.

## Jeniece Carroll

42.     Plaintiff Jeniece Carroll was employed by Tyson or one of its predecessor companies from January 1, 1998 to June 2, 1999.  She was assigned to the day shift in the individually Quick Frozen Department (IQF) at a chicken processing plant owned by Tyson in Albertville, Alabama.  As an employee in IQF, Plaintiff Carroll worked on freezing chicken parts.

43.     Plaintiff Carroll was required to wear various safety and sanitary equipment and gear for her position in the IQF department, including a coat, hairnet, ear plugs, cotton liner gloves, rubber outer gloves and rubber-soled shoes.  Tyson required Plaintiff Carroll to obtain some equipment from the supply room on a daily basis.

44.     Before reporting to her work station each day, Plaintiff Carroll had to wait in line to obtain equipment and gear from the supply room, don all her safety and sanitary equipment and gear, sanitize her hands and get to her position on the line, all of which typically took a total of 10 minutes.  Plaintiff Carroll was not compensated for any of these activities which were integral and indispensable to Tyson's chicken processing business and related to her principal employment duties.

-11-

45.    Plaintiff Carroll was compensated by Tyson according to "line time," which began at approximately 7:30 a.m. when her supervisor swiped a separate time card for the IQF Department. Her pay ended when her supervisor again swiped the time card, usually at approximately 4:00 p.m.

46.    After she completed her work in the IQF Department, Plaintiff Carroll cleaned up and removed her required safety and sanitary equipment and gear, which typically took approximately 2 minutes. Plaintiff Carroll was not compensated for any of these activities which were integral and indispensable to Tyson's chicken processing business and relate to her principal employment duties.

47.    Plaintiff Carroll was entitled to first one, and later (after April 15, 1999) two, 30-minute unpaid breaks each day. Plaintiff Carroll had to clean up and remove her gear before going on break and had to don the gear and return to her post before the 30 minute break ended. As a result, Plaintiff Carroll worked for four minutes out of each unpaid 30-minute break, performing work which was integral and indispensable to Tyson's chicken processing business and related to her principal employment duties.

48.    Plaintiff Carroll's supervisors knew she was not compensated for all work performed. Each day, they saw her performing integral and indispensable tasks for the benefit of Tyson, determined the amount of time for which Plaintiff Carroll would be compensated, and got a report each day about the hours Plaintiff Carroll had worked on the previous day.

49.    Plaintiff Carroll was compensated for approximately 40 hours of work per week. In total, Plaintiff Carroll was denied compensation, either at a regular rate or at an overtime

-12-

premium, for approximately 20 minutes per day, or approximately one hour and 40 minutes worked in excess of 40 hours per work week.

## Teresa Brothers

50. Plaintiff Teresa Brothers has been employed by Tyson or one of its predecessor companies since September 1996. She is assigned to the day shift in the Cut-up Department at a chicken processing plant owned by Tyson in Albertville, Alabama. As an employee in Cut-up, Plaintiff Brothers cuts and rips the chickens into separate constituent body parts for packaging.

51. Plaintiff Brothers is required to wear various safety and sanitary equipment and gear for her position in the Cut-up department, including a smock, plastic apron, plastic sleeve covers, hairnet, ear plugs, cotton liner gloves, rubber outer gloves, chain gloves, thermal gloves and rubber-soled shoes. Tyson requires Plaintiff Brothers to obtain some of this equipment from the supply room on a daily basis.

52. At the end of her shift each day, Plaintiff Brothers waits in line to obtain her equipment for the next day. Each day she waits in line approximately 15 minutes. Before reporting to her work station each day, Plaintiff Brothers must punch in, go to her locker to secure her personal belongings and don all her safety and sanitary equipment and gear, sanitize her hands and get to her position on the line, all of which typically takes a total of five minutes. Plaintiff Brothers is not compensated for any of these activities which are integral and indispensable to Tyson's chicken processing business and relate to her principal employment duties.

53. Plaintiff Brothers is compensated by Tyson according to "line time," which begins at approximately 6:15 a.m. when her supervisor swipes a separate time card for the Cut-

-13-

up Department. Her pay ends when her supervisor again swipes the time card, usually at approximately 2:45 p.m. However, Plaintiff Brothers is not permitted to leave her position in the line until the last bird passes her station, which is usually approximately seven minutes after the line has been punched out. Plaintiff Brothers is not compensated for this additional work on the line which is integral and indispensable to Tyson's chicken processing business and relates to her principal employment duties.

54.     After she completes her work in the Cut-up Department, Plaintiff Brothers cleans up and removes her required safety and sanitary equipment and gear, which typically takes approximately 5 minutes. Plaintiff Brothers is not compensated for any of these activities which are integral and indispensable to Tyson's chicken processing business and relate to her principal employment duties.

55.     Plaintiff Brothers is entitled to first one and later (after April 15, 1999) two 30-minute unpaid break each day. Plaintiff Brothers has to clean up and remove her gear before going on break and has to don the gear and return to her post before the 30-minute break ends. As a result, Plaintiff Brothers receives less than 20 minutes of each unpaid 30-minute break because she performs more than 10 minutes of work which is integral and indispensable to Tyson and relates to her principal employment duties.

56.     Plaintiff Brothers' supervisors know she is not compensated for all work performed. Each day, they see her performing integral and indispensable tasks for the benefit of Tyson, they determine the amount of time for which Plaintiff Brothers is compensated, and get a report each day about the hours Plaintiff Brothers worked on the previous day.

-14-

57.     Plaintiff Brothers is compensated for approximately 40 hours of work per week. In total, Plaintiff Brothers is denied compensation, either at a regular rate or at an overtime premium, for at least one hour and thirty minutes per day, or at least seven hours and thirty minutes worked in excess of 40 hours per work week.

## Angela Hatchett

58.     Plaintiff Angela Hatchett has been employed by Tyson or one of its predecessor companies since 1995. She is assigned to the day shift in the MRB Department at a chicken processing plant owned by Tyson in Albertville, Alabama. As an employee in MRB, Plaintiff Hatchett prepares chickens for the application of marinades or breading.

59.     Plaintiff Hatchett is required to wear various safety and sanitary equipment and gear for her position in the MRB department, including a smock, plastic apron, plastic sleeve covers, hairnet, ear plugs, cotton liner gloves, rubber outer gloves, cutting gloves, and rubber-soled boots. Tyson requires Plaintiff Hatchett to obtain some equipment from the supply room on a daily basis.

60.     Before reporting to her work station each day, Plaintiff Hatchett must punch in; wait in line at the supply room to obtain equipment and supplies (garbage bags, soap, paper towels and dip); go to her locker for other equipment; don all her safety and sanitary equipment and gear; and sanitize her hands and get to her position on the line, all of which typically take a total of 20-25 minutes. Plaintiff Hatchett is not compensated for any of these activities which are integral and indispensable to Tyson's chicken processing business and relate to her principal employment duties.

-15-

61. Plaintiff Hatchett is compensated by Tyson for a flat 8.5 hours per day in her position as floor person; her compensation is not based on the time that she punches in or out. In 1997 and earlier, when Ms. Hatchett worked in the MRB Department on the line, she was compensated according to "line time," which began when her supervisor swiped a separate time card for the MRB Department and ended when her supervisor again swiped the time card.

62. Plaintiff Hatchett is entitled to two 30-minute unpaid breaks each day; prior to April 1999, she was only entitled to one 30-minute break. The 30-minute break is considered to have begun when the last product arrives at the first position in the line, even though Ms. Hatchett and other employees continue to work anywhere from two to seven minutes after break time begins. Further, before Plaintiff Hatchett can go on break she has to clean up and remove her gear and at the end of her break she has to don the gear and return to her post before the 30-minute break ends. As a result, Plaintiff Brothers receives less than 20 minutes of each unpaid 30-minute break because she performs approximately 15 minutes of work which is integral and indispensable to Tyson and relates to her principal employment duties.

63. Plaintiff Hatchett's supervisors know she is not compensated for all work performed. Each day, they see her performing integral and indispensable tasks for the benefit of Tyson, determine the time for which Plaintiff Hatchett is compensated, and get a report about the hours Plaintiff Hatchett worked on the previous day.

64. Plaintiff Hatchett is compensated for approximately 42.5 hours of work per week. In total, Plaintiff Hatchett is denied compensation, either at a regular rate or at an overtime premium, for at least one hour and 20-25 minutes per day, or at least six hours and 40 minutes to seven hours and five minutes worked in excess of 40 hours per work week.

-16-

**Sharon Mitchell**

65.     Plaintiff Sharon Mitchell was employed by Tyson from approximately March 1998 through January 1999.  She was assigned to the day shift on the Debone Line at a chicken processing plant owned by Tyson in Vienna, Georgia.  As an employee in the Debone Line, Plaintiff Mitchell removed bones and other unwanted portions of the chicken.

66.     While employed by Tyson, Plaintiff Mitchell was required to wear various safety and sanitary equipment and gear for her position in the Debone Line, including a smock, a plastic apron, hairnet, ear plugs, hard plastic arm guard, thin knit gloves, white cotton liner gloves, and green or blue rubber outer gloves, mesh cutting gloves, and rubber boots.  Tyson required Plaintiff Mitchell to obtain some equipment from the supply room on a daily basis.

67.     Before reporting to her work station each day, Plaintiff Mitchell had to go to her locker to obtain some equipment and gear, wait in line to other equipment and gear from the supply room, don all her safety and sanitary equipment and gear, sanitize her hands; and get to her position on the line, all of which typically took a total of at least 5-10 minutes.  Plaintiff Mitchell was not compensated for any of these activities which were integral and indispensable to Tyson's chicken processing business and related to her principal employment duties.

68.     Plaintiff Mitchell was compensated by Tyson according to "line time," which began at approximately 7:00 a.m. when the first chicken came down the shoot into Debone, and ended at approximately 4:00 p.m. when the last chicken came down the shoot into Debone. After the last chicken entered Debone, it took the chicken approximately 12 minutes to reach the end of the Debone line.  Because of this, Plaintiff Mitchell usually worked approximately 5 minutes on the line after the line had been punched out for the day.

69. After she completed her work in the Debone Line, Plaintiff Mitchell cleaned up and removed her required safety and sanitary equipment and gear and turned in her smock, which typically took approximately 10-15 minutes. Plaintiff Mitchell was not compensated for any of these activities which were integral and indispensable to Tyson's chicken processing business and related to her principal employment duties.

70. Plaintiff Mitchell was entitled to two 30-minute unpaid lunch break each day. Her break period began when the last bird arrived at the beginning of the line. Plaintiff Mitchell was not permitted to leave her position in the line until the last bird passed her station which could be 2-12 minutes later depending on where on the line she was working. Then she had to clean up and remove her gear before going on break, and don the gear and return to her post, before the 30-minute break ended. As a result, Plaintiff Mitchell received less than 15 minutes of each unpaid 30-minute break because she performed approximately 15 minutes work during her break which was integral and indispensable to Tyson's chicken processing business and related to her principal employment duties.

71. In addition, Plaintiff Mitchell was regularly required to work additional time at the end of each shift, called "re-work," usually for an additional 1-1.5 hours, three to four days each week.

72. Plaintiff Mitchell's supervisors knew she was not compensated for all work performed. Each day, they saw her performing integral and indispensable tasks for the benefit of Tyson, determined the amount of time for which Plaintiff Mitchell was compensated and got a report each day about the hours Plaintiff Mitchell worked on the previous day.

73.     Plaintiff Mitchell was compensated for approximately 40 hours of work per week. In total, Plaintiff Mitchell was denied compensation, either at a regular rate or at an overtime premium, for approximately one hour and 20-30 minutes per day, or approximately six to seven and a half hours per week worked in excess of 40 hours per work week. With the additional 3-6 hours per week of re-work, Ms. Mitchell was denied compensation for a total of nine to twelve hours of work per week.

**Thomas Lee White**

74.     Plaintiff Thomas Lee White has been employed by Tyson or one of its predecessor companies since 1990 and currently works the night shift as a Killer in the Receiving Department at a chicken processing plant owned by Tyson in Berlin, Maryland. As a Killer, Plaintiff White monitors the slaughter of the chickens by the machinery and slits the necks of the chickens that the machine fails to kill properly.

75.     Plaintiff White is required to wear various safety and sanitary gear and equipment for his position as a Killer, including a smock or coat, a plastic apron, hard plastic arm guards, a rubber rain suit (pants and coat), safety glasses, ear plugs, rubber gloves, chain or cutting gloves, tall rubber boots, a skull cap, a paper face mask, and a freezer suit in the winter time. Tyson requires Plaintiff White to obtain a new smock or coat and gloves on a daily basis.

76.     Before he reports to his work station each day Plaintiff White and another employee take turns waiting in line to obtain certain equipment and gear from the supply room for the entire Department. Plaintiff White then walks to his locker to obtain and don additional safety and sanitary gear and equipment. These activities typically take a total of approximately 10-30 minutes. Plaintiff White is not compensated for any of these activities which are integral

-19-

and indispensable to Tyson's chicken processing business and which relate to his principal employment duties.

77. Plaintiff White is compensated by Tyson according to "line time," which begins at approximately 2:35 p.m. when his supervisor swipes a separate time card for the Receiving, Live Hanging, and Evisceration lines. His pay ends when his supervisor again swipes the time card, usually when the last bird is hung for that shift by the first live hanger. Typically, Plaintiff White is required to work approximately 10-25 minutes each day after his supervisor has "punched out" his work station with the time card, signaling the end of "line time." Plaintiff White is not compensated for this additional off-the-clock work.

78. After he has completed his work on the Receiving line, Plaintiff White cleans up and removes his required safety and sanitary clothing and equipment, and then cleans up the blood, debris and other waste in the Receiving Department, which typically takes a total of approximately 15-30 minutes. At least once a week, he is required to catch any chickens that get loose outside and to pick up any dead chickens. This typically takes an additional 30-45 minutes. Plaintiff White is not compensated for any of these activities which are integral and indispensable to Tyson's chicken processing business and which relate to his principal employment duties.

79. Plaintiff White is entitled to one 30-minute unpaid lunch break. Plaintiff White must clean up and remove his gear before going on his unpaid lunch break and then put his gear back on before returning to work. As a result, Plaintiff White receives less than 20 minutes of each unpaid 30-minute break because he performs more than 10 minutes of work which is integral and indispensable to Tyson and relates to his principal employment duties.

-20-

80.     Plaintiff White's supervisors know he is not compensated for all work performed. Each day, they see him performing integral and indispensable tasks for the benefit of Tyson, they determine the amount of time for which Plaintiff White will be compensated, and get a report each day about the hours Plaintiff White worked on the previous day.

81.     Plaintiff White is compensated for approximately 37-40 hours of work per week. Plaintiff White is denied compensation, either at a regular rate or at an overtime premium, for work performed. Such uncompensated time ranges from more than an hour to more than two and a half hours per day and between approximately three hours to more than 12 hours in excess of 40 hours per work week.

**Ava Joyner**

82.     Plaintiff Ava Joyner has been employed by Tyson or one of its predecessor companies since 1988 and currently works as a Knife Sharpener in the Evisceration Department at a chicken processing plant owned by Tyson in Corydon, Indiana. In the last three years, she has also worked as a Trimmer and in Hearts and Livers on the line in the Evisceration Department at that same plant. As an employee on the Evisceration line, Plaintiff Joyner was responsible for scooping and cutting the innards out of the carcasses of the dead birds, using knives and her hands. As a Knife Sharpener, she is still required to work on the Evisceration line approximately once a week, but is additionally required to sharpen the knives for the Department at the end of the shift.

83.     Plaintiff Joyner is required to wear various safety and sanitary equipment and gear for her positions as a Knife Sharpener and on the line in the Evisceration Department, including a smock or coat, a plastic apron, a hairnet, safety glasses, a bump cap, ear plugs, cotton liners and

-21-

rubber outer gloves, mesh or cutting gloves, and boots. Tyson requires Plaintiff Joyner to be issued a new smock or coat, cotton liners and rubber outer gloves, and a hairnet, on a daily basis. In addition, new items must be obtained at least once a week, including a plastic apron, rubber gloves, a hairnet, and cotton gloves.

## (a)    On the Evisceration Line

84.    When Plaintiff Joyner worked exclusively on the Evisceration line, before she reported to her work station each day she had to wait in line to obtain certain equipment and gear from the supply room, walk to her locker to obtain additional gear and equipment, don all of her safety and sanitary gear and equipment, and arrive at her post before the scheduled time for the line to move. Together, these activities typically took about 10 minutes. Plaintiff Joyner was not compensated for any of these activities which were integral and indispensable to Tyson's chicken processing business and which related to her principal employment duties.

85.    On the Evisceration line, Plaintiff Joyner was not compensated for time worked until her supervisor swiped a separate time card for the line, signaling the beginning of line time. The time for which she was compensated ended when her supervisor swiped the time card for the line at the end of the shift. But Plaintiff Joyner often was required to continue working until a replacement worker filled her position on the line. Then she had to clean up, remove her gear and equipment, and bring her knives to the Knife Sharpener. All of these activities, which were integral and indispensable to Tyson's chicken processing business and related to her principal employment duties, took about 5 minutes. She was not compensated for performing these tasks.

86.    On the Evisceration line, Plaintiff Joyner was entitled to one 30-minute unpaid lunch break. Her break period began when the last bird arrived at the beginning of the line.

Joyner worked at a post that was in the middle or near the end of the line. She was not permitted to leave her position in the line until the last bird passed her station. Then she had to clean up and remove her gear before going on break and had to don the gear and return to her post before the 30 minute break ended. As a result, Plaintiff Joyner received less than 20 minutes of each unpaid break because she performed more than 10 minutes of work which was integral and indispensable to Tyson and related to her principal employment duties.

87.     When Plaintiff Joyner worked exclusively on the Evisceration line, her supervisors knew that she was not compensated for all work performed. Each day, they saw her performing integral and indispensable tasks for the benefit of Tyson, they determined times when Ms. Joyner was compensated for time worked, and received a report each day about the hours Plaintiff Joyner worked the day before

88.     When Plaintiff Joyner worked exclusively on the Evisceration line, she was compensated for only 40 hours of work per week. As a result, she was denied compensation, either at regular rates or overtime premium, for work performed for approximately 45 minutes per day or a total of about three hours and 45 minutes in excess of 40 hours per week.

**(b)     As a Knife Sharpener**

89.     Before she reports to her work station each day, Plaintiff Joyner must wait in line to obtain certain equipment and gear from the supply room, walk to her locker to obtain additional gear and equipment, don all of her safety and sanitary gear and equipment, and be at her post ahead of schedule. Together, these tasks typically take about 10 minutes. Plaintiff Joyner is not compensated for any of these activities which are integral and indispensable to Tyson's chicken processing business and which relate to her principal employment duties.

-23-

90.     As a Knife Sharpener, Plaintiff Joyner is not compensated until her supervisor has swiped a time card for the line, signaling the beginning of line time.

91.     As a Knife Sharpener, Plaintiff Joyner is entitled to one 30-minute unpaid lunch break each day. Plaintiff Joyner must clean up and remove her gear before going on her lunch break and then don her gear before the break concludes. These tasks take approximately 2 minutes. Plaintiff Joyner is not compensated for any of these activities which are integral and indispensable to Tyson's chicken processing business and which relate to her principal employment duties.

92.     In her current position as a Knife Sharpener in the Evisceration Department, Plaintiff Joyner's supervisors know she is not compensated for all work performed. Each day, they see her performing integral and indispensable tasks for the benefit of Tyson, they determine the amount of time for which she is compensated and they receive a report about the hours Plaintiff Joyner worked on the previous day.

93.     In her current position as a Knife Sharpener in the Evisceration Department, Plaintiff Joyner is compensated for approximately 42.5 hours of work per week. She is denied compensation, either by a regular rate or an overtime premium, for work performed for at least an additional 10 minutes per day or a total of 50 minutes per week in excess of 40 hours each week

## Janet Garrett

94.     Plaintiff Janet Garrett has been employed by Tyson or one of its predecessor companies at a chicken processing plant owned by Tyson in Robards, Kentucky since June 1996. Between June 1996 and March 1998, she worked as a Back-up Killer in the Receiving/Live

Hanging Department and as a Final Trimmer and in other positions on the line in the Evisceration Department. Since March 1998, Plaintiff Garrett has worked as a Chill Monitor in the Evisceration Department on the day shift and also performs work on the Evisceration line.

### (a)    On the Evisceration Line

95.    When Plaintiff Garrett works on the Evisceration line, either in her former positions or in her current job as a Chill Monitor, she is required to wear various safety and sanitary gear and equipment, including a smock or jacket, a plastic apron, plastic sleeve covers, a hairnet, safety glasses, ear plugs, a dust mask, cotton liners and rubber outer gloves, mesh or cutting gloves, steel gloves, and boots. Tyson requires Plaintiff Garrett to obtain much of this gear daily.

96.    Before reporting to her work station when she worked exclusively on the Evisceration line, Plaintiff Garrett had to wait in line to obtain certain equipment and gear from the supply room, walk to her locker to obtain additional equipment and gear, don all of her safety and sanitary equipment and gear, and arrive at her work station before the line was scheduled to begin to move. Together these activities typically took at least 15 minutes. Plaintiff Garrett was not compensated for any of these activities which were integral and indispensable to Tyson's chicken processing business and which related to her principal employment duties.

97.    On the Evisceration line, Plaintiff Garrett was compensated by Tyson according to "line time" which began at 7:00 a.m. when she had to be at her post and her supervisor swiped a separate time card for the Evisceration Department.

98.    When she worked exclusively on the Evisceration line, "line time" ended when her supervisor swiped the time card for the Evisceration Department, which took place when the

-25-

last bird on the line was hung by the first live hanger for that shift. This occurred approximately 20 minutes before the last bird reached Plaintiff Garrett's station. Although Plaintiff Garrett had to continue working until the last bird arrived at her station, she was not compensated for any time spent working beyond the moment that the supervisor swiped the time card. At the end of her shift, Plaintiff Garrett then had to clean up and remove her required safety and sanitary gear and equipment. In total, Plaintiff Garrett typically worked or engaged in activities for approximately 30 minutes after "line time" had ended each day, but was not compensated for this time, which was integral and indispensable to Tyson's chicken processing business and related to her principal employment duties.

99.     When she worked exclusively on the Evisceration line, Plaintiff Garrett was entitled to two 30-minute breaks, the first 10 minutes of which were paid and the last 20 minutes of which were unpaid. Her break began when the last bird left her station. However, before she could go on break, she had to clean up and remove some of her equipment. She then had to put it all back on again before going back to work. In addition, at least once a week, Plaintiff Garrett was asked to end her break early and return to her work station early. As a result, Plaintiff Garrett received less than 20 minutes of each unpaid break because she was performing work which was integral and indispensable to Tyson and related to her principal employment duties.

100.     When she worked exclusively on the Evisceration line, Plaintiff Garrett's supervisors knew she was not compensated for all work performed. Each day, they saw her performing integral and indispensable tasks for the benefit of Tyson, were in control of the punching in and out of the line cards, and got a report about the hours Plaintiff Garrett worked on the previous day.

-26-

101.    When Plaintiff Garrett worked exclusively on the Evisceration line, she was scheduled and compensated for approximately 40 hours of work per week. In total, Plaintiff Garrett was denied compensation, either by a regular rate or overtime premium, for approximately 1 hour and 25 minutes per day or 7 hours and 55 minutes in excess of 40 hours per work week.

### (b)    As a Chill Monitor

102.    In her current job as a Chill Monitor, Plaintiff Garrett is required to wear various safety and sanitary gear and equipment, including a smock or jacket, a hairnet, ear plugs, cotton liners and rubber outer gloves, and boots. However, when she is assigned to work on the Evisceration line each day, she is required to put on additional safety and sanitary gear and equipment, including a plastic apron, plastic sleeve covers, safety glasses, a dust mask, mesh or cutting gloves, and steel gloves. Tyson requires Plaintiff Garrett to obtain much of this gear on a daily basis.

103.    Before reporting to her work station as a Chill Monitor each day, Plaintiff Garrett must wait in line to obtain certain equipment and gear from the supply room, walk to her locker to obtain additional equipment and gear, don all of her safety and sanitary equipment and gear, and then walk to her work station, which takes a total of at least five minutes. Plaintiff Garrett is not compensated for any of these activities which are integral and indispensable to Tyson's chicken processing business and which relate to her principal employment duties.

104.    After Plaintiff Garrett has punched out and is no longer compensated, she has to clean up and remove her required safety and sanitary gear and equipment, which typically takes at least 5 minutes. Plaintiff Garrett is not compensated for these activities, which are integral and

-27-

indispensable to Tyson's chicken processing business and relate to her principal employment duties.

105. In her current position as a Chill Monitor, Plaintiff Garrett is entitled to two 30-minute breaks, the first 10 minutes of which are paid and the last 20 minutes of which are unpaid. Before she can go on break, she has to clean up and remove some of her equipment. She then has to put it all back on before going back to work. In addition, she must get new gloves during at least one unpaid break each day. As a result, Plaintiff Garrett receives less than 20 minutes of each unpaid break because she is performing work which is integral and indispensable to Tyson and relates to her principal employment duties.

106. Plaintiff Garrett's supervisors know she is not compensated for all work performed. Each day, they see her performing integral and indispensable tasks for the benefit of Tyson, are in control of the punching in and out of the line cards, and get a report each day about the hours Plaintiff Garrett has worked on the previous day.

107. In her current job as a Chill Monitor, Plaintiff Garrett is scheduled and compensated for approximately 40 hours of work per week. In total, Plaintiff Garrett is denied compensation, either at a regular rate or at an overtime premium, for approximately 50 minutes per day, or four hours and 10 minutes in excess of 40 hours per work week.

**Winfred Earl**

108. Plaintiff Winfred Earl has been employed by Tyson or one of its predecessor companies at a chicken processing plant owned by Tyson in Shelby County, Texas since July 31, 1995. During her employment, she has worked in the Labeling and Hanging and Grading Departments. Currently, she works in the Hanging and Grading Department on the night shift,

which begins at 4:00 p.m. and ends at 1:00 a.m., depending on how many birds come through the line on a given day.

109.    Plaintiff Earl is required to wear various safety and sanitary gear and equipment for her position in the Hanging and Grading Department, including a smock, a plastic apron, a hairnet, ear plugs, cotton liners and rubber outer gloves, rubber boots, and plastic sleeve protectors.

110.    Before she reports to her work station each day, Plaintiff Earl must wait in line to obtain a clean smock at the supply room, walk to her locker to obtain additional equipment and gear, and then don all safety and sanitary equipment and gear, all of which typically takes a total of approximately 5 minutes. Plaintiff Earl is not compensated for any of these activities which are integral and indispensable to Tyson's chicken processing business and which relate to her principal employment duties.

111.    Plaintiff Earl is compensated according to "line time," which begins at approximately 4:00 p.m. when her supervisor has swiped a separate time card for the line.

112.    After she has completed her work on the line, Plaintiff Earl must clean up and remove her required safety and sanitary clothing and equipment and return her smock, which typically takes a total of approximately 10 minutes. Plaintiff Earl is not compensated for any of these activities which are integral and indispensable to Tyson's chicken processing business and which relate to her principal employment duties.

113.    Plaintiff Earl is entitled to two 30-minute unpaid breaks each day. Before going on break, she must clean up and remove her safety and sanitary gear and equipment and then put on her gear and equipment at the end of the break. As a result, Plaintiff Earl receives less than 20

minutes of each unpaid 30-minute break because she performs more than 10 minutes of work which is integral and indispensable to Tyson and relates to her principal employment duties.

114.    Plaintiff Earl's supervisors know she is not compensated for all work performed. Each day, they see her performing integral and indispensable tasks for the benefit of Tyson, are in control of the punching in and out of the line cards, and get a report each day about the hours Plaintiff Earl has worked on the previous day.

115.    Plaintiff Earl is scheduled and compensated for approximately 40 hours of work per week. In total, Plaintiff Earl is not compensated, either at a regular rate or at an overtime premium, for approximately one hour and 15 minutes per day, or six hours and 15 minutes in excess of 40 hours per work week.

## Princess Brown

116.    Plaintiff Princess Brown has been employed by Tyson or one of its predecessor companies since 1985 and currently works the day shift in the Deboning Department at a chicken processing plant owned by Tyson in Jackson, Mississippi. As an employee in the Deboning Department, Plaintiff Brown extracts the bones and other debris out of the bodies of the chickens.

117.    Plaintiff Brown is required to wear certain safety and sanitary gear and equipment for her position in the Deboning Department, including a smock, a plastic apron, a hairnet, chain gloves, plastic sleeve covers, ear plugs, cotton liners and rubber outer gloves, and rubber-soled shoes. Once a month, Tyson issues Plaintiff Brown three aprons, four hairnets, and three pairs of gloves. Each day, Plaintiff Brown is required to get a new smock from the supply room.

-30-

118.    Before reporting to her work station each day, Plaintiff Brown must wait in line to obtain a smock from the supply room, walk to her locker to obtain additional gear and equipment, and then don all safety and sanitary equipment and gear, all of which typically takes a total of at least 15 minutes. Plaintiff Brown is not compensated for any of these activities which are integral and indispensable to Tyson's chicken processing business and which relate to her principal employment duties.

119.    Plaintiff Brown is compensated according to "line time," which begins at approximately 7:00 a.m. when her supervisor swipes a separate time card for the Deboning line. "Line time" ends for the Deboning Department at approximately 4:15 p.m., even though Plaintiff Brown continues to work after the line card has been swiped and her work time is no longer recorded or compensated.

120.    After she has completed her work on the Deboning line, Plaintiff Brown cleans up and removes her required safety and sanitary gear and equipment, which typically takes approximately 10 minutes. Plaintiff Brown is not compensated for any of these activities which are integral and indispensable to Tyson's chicken processing business and which relate to her principal employment duties.

121.    Plaintiff Brown is entitled to two 30-minute unpaid breaks. At the beginning of her break, she must wash and hang up her apron and then put her gear back on before returning to work. As a result, Plaintiff Brown receives less than 20 minutes of each unpaid 30-minute break because she performs more than 10 minutes of work which is integral and indispensable to Tyson and relates to her principal employment duties.

-31-

122.    Plaintiff Brown's supervisors know she is not compensated for all work performed. Each day, they see her performing integral and indispensable tasks for the benefit of Tyson, are in control of the punching in and out of the line cards, and get a report each day about the hours Plaintiff Brown has worked on the previous day.

123.    Plaintiff Brown is compensated for approximately 40 hours of work per week. In total, Plaintiff Brown is denied compensation, either at a regular rate or at an overtime premium, for approximately one hour and 25 minutes per day, or seven hours and five minutes in excess of 40 per work week, that she is entitled to receive.

## Pamela Woodworth

124.    Plaintiff Pamela Woodworth has been employed by Tyson or one of its predecessor companies since June 1981 and currently works as a Liver and Heart Harvester in the Evisceration Department at a chicken processing plant owned by Tyson in Noel, Missouri. As an employee in the Evisceration Department, Plaintiff Woodworth extracts the livers and hearts out of the bodies of the chickens.

125.    Plaintiff Woodworth is required to wear various safety and sanitary gear and equipment for her position on the Evisceration line, including a plastic apron, a hairnet, safety glasses, ear plugs, rubber outer gloves, and rubber boots. Each day, Plaintiff Woodworth is required to obtain new rubber outer gloves from the supply room.

126.    Before reporting to her work station each day, Plaintiff Woodworth must wait in line to obtain rubber gloves from the supply room, walk to her locker to obtain additional gear and equipment, don all safety and sanitary equipment and gear, and then walk to her station, all of which typically takes a total of at least 5 minutes. Plaintiff Woodworth is not compensated for

-32-

any of these activities which are integral and indispensable to Tyson's chicken processing business and which relate to her principal employment duties.

127.    Plaintiff Woodworth is compensated by Tyson according to "line time," which begins at approximately 6:00 a.m. when her supervisor has swiped a time card for the line. "Line time" ends when the last bird arrives at the first work station. In addition, Plaintiff Woodworth is required to wait on the line until a replacement worker has filled her position. After she has completed her work on the line, Plaintiff Woodworth must then wait in line at the wash station, clean-up, and remove her required safety and sanitary gear and equipment. Accordingly, Plaintiff Woodworth typically continues to work off-the-clock and engages in work activities for approximately 10 minutes after the supervisor has punched out the line, and is not compensated for this additional work which is integral and indispensable to Tyson's chicken processing business and which relates to her principal employment duties.

128.    Plaintiff Woodworth is entitled to two 30-minute unpaid breaks each day. Plaintiff Woodworth is usually not permitted to leave her work station until several minutes after each of her unpaid breaks have begun. In addition, before she can go on break, Plaintiff Woodworth must wash up and remove some of her safety and sanitary gear and equipment. She must then put her gear back on before returning to work. As a result, Plaintiff Woodworth receives less than 20 minutes of each unpaid 30-minute break because she performs more than 10 minutes of work which is integral and indispensable to Tyson and relates to her principal employment duties.

129.    Plaintiff Woodworth's supervisors know she is not compensated for all work performed. Each day, they see her performing integral and indispensable tasks for the benefit of

-33-

Tyson, are in control of the punching in and out of the line cards, and get a report each day about the hours Plaintiff Woodworth has worked on the previous day.

130.    Plaintiff Woodworth is compensated for approximately 40 hours of work per week. In total, Plaintiff Woodworth is denied compensation, either at a regular rate or at an overtime premium, for approximately one hour and 15 minutes per day, or six hours and 15 minutes in excess of 40 per work week.

## COLLECTIVE ACTION ALLEGATIONS

131.    Plaintiffs bring this action on behalf of themselves and the following proposed class of all similarly-situated employees: all current and former employees of Tyson who have held non-exempt positions at any time during all or any part of the period beginning three years before the filing of this Complaint to the present, and who have not been fully compensated for all hours worked.

132.    Tyson operates approximately 60 chicken processing plants in the United States, including five in Northern Alabama, and employs at any one time one or more employees in each plant. During the three years prior to the commencement of this action, Tyson has employed approximately 50,000 non-exempt employees annually. Upon information and belief, there will be thousands of potential members of the collective action. *See* Consents to Become Party Plaintiff of 159 individuals, attached hereto. Thus, the class is so numerous that joinder of all members is impractical.

133.    The non-exempt employees have been subject to the unlawful practices alleged herein, and therefore, are similarly situated to the named representatives in this collective action.

-34-

134.    The employment policies, practices and agreements of Tyson raise questions of
fact common to the class including:

(a)    whether Tyson has engaged in a pattern and practice of permitting or
requiring Plaintiffs and members of the proposed class to work "off-the-clock" hours before "line
time" had begun, after "line time" had ended, or during unpaid breaks, and in addition to
working 40 hours in a work week, for the benefit of Tyson and without appropriate
compensation, in violation of the FLSA, and whether such activities are integral and
indispensable and relate to the non-exempt employees' principal employment duties at chicken
processing plants owned by Tyson;

(b)    whether Tyson has engaged in a pattern and practice of failing to keep
accurate records showing all hours worked by Plaintiffs and members of the proposed class, in
violation of the FLSA;

(c)    whether Tyson has engaged in a pattern and practice of permitting or
requiring Plaintiffs and members of the proposed class to work overtime in excess of 40 hours in
a work week without appropriate compensation, in violation of the FLSA;

(d)    whether Tyson has engaged in a pattern and practice of permitting or
requiring Plaintiffs and members of the proposed class to perform work for the benefit of Tyson
during unpaid breaks;

(e)    whether the conduct of Tyson was willful;

(f)    whether Plaintiffs and members of the proposed class are entitled to lost
wages, liquidated damages and the other relief requested.

-35-

135.    The claims of the named Plaintiffs are similar to those of the class members, in that Plaintiffs have been subject to the same conduct as members of the putative collective action and Plaintiffs' claims are based on the same legal theory as members of the collective action.

136.    The claims of the named Plaintiffs are typical of the claims of others in this collective action, and the named Plaintiffs will fairly and adequately protect the interests of those they seek to represent.

137.    Plaintiffs' FLSA claims are maintainable as a collective action pursuant to Section 16(b) of the FLSA, 29 U.S.C. § 216(b).

138.    The prosecution of separate actions by individuals without certification as a collective action would create a risk of:

(a)    inconsistent or varying adjudications with respect to individual members of the collective action that would establish incompatible standards of conduct for the party opposing the action; and

(b)    adjudications with respect to individual members of the collective action that would as a practical matter be dispositive of the interests of the other members not parties to the adjudications, or substantially impair or impede their ability to protect their interests.

139.    The questions of law and fact common to the members of the collective action predominate over any questions affecting only individual members and a collective action is superior to other available methods for the fair and efficient adjudication of the controversy.

140.    Members of the collective action have little or no interest in individually controlling the prosecution of separate actions because the individual claims are not large and the burdens of litigation are too great for most individuals.

141. A collective action is superior to other available methods, such as individual interventions or the consolidation of the individual actions, and will result in a fair and efficient adjudication of this controversy.

## FLSA CLAIM

142. Plaintiffs incorporate by reference all preceding paragraphs as if the same were set forth again fully at this point.

143. For the past three years, Tyson has willfully violated the FLSA by engaging in a pattern or practice of

(a) failing to keep accurate records showing all the time it permitted Plaintiffs and members of the proposed collective action to work, which has resulted in the denial of compensation, either at a regular rate or an overtime premium, as required by the FLSA, for all time worked in excess of 40 hours in a work week;

(b) permitting or requiring Plaintiffs and members of the proposed collective action to perform integral and indispensable activities before and after the regular paid work time and in addition to working 40 hours in a work week, for the benefit of Tyson and without compensation at the applicable federal overtime rates;

(c) permitting or requiring Plaintiffs and members of the proposed collective action to work "off-the-clock" hours before "line time" had begun or after "line time" had ended, including during unpaid breaks, for the benefit of Tyson, in addition to working 40 hours in a work week, and without compensation at the applicable federal overtime rates;

(d) permitting or requiring Plaintiffs and members of the proposed collective action to work overtime in excess of 40 hours in a work week without appropriate compensation.

-37-

(e)     permitting or requiring Plaintiffs and members of the proposed class to

perform work for the benefit of Tyson during unpaid breaks and, as a result, causing Plaintiffs

and members of the proposed class to receive unpaid rest periods of 20 minutes or less per work

day.

## PRAYER FOR RELIEF

Plaintiffs pray for judgment against Tyson as follows:

A.     Certifying this action as a collective action with adequate notice to be supervised

by the Court;

B.     Awarding damages from Tyson for Plaintiffs and members of the proposed class,

including compensation for unrecorded work time, and liquidated and exemplary damages, in

amounts to be proven at trial;

C.     Awarding all costs of litigation, including expert fees and attorneys' fees;

D.    Awarding such other legal and equitable relief as the Court deems proper; and

The plaintiffs demand a trial by jury.

DATED: June 22, 1999          Respectfully submitted,


_____
Joseph M. Sellers, Esq. (D.C. Bar No. 318410)
Christine E. Webber, Esq. (D.C. Bar No. 439368)
Charles E. Tompkins, Esq. (D.C. Bar No. 459854)
COHEN, MILSTEIN, HAUSFELD
  & TOLL, P.L.L.C.
1100 New York Avenue, N.W.
West Tower - Suite 500
Washington, D.C.  20005
Telephone:  (202) 408-4600
Facsimile:  (202) 408-4699


_____
Frederick T. Kuykendall, III, Esq.(AL Bar No.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)
S.C. Middlebrooks, Esq.(AL Bar No. 42207204496)
Candis McGowan, Esq. (AL Bar No. 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)
GARDNER, MIDDLEBROOKS, FLEMING
  & GIBBONS
Suite 450, McAdory Building
2013 1st Avenue North
Birmingham, AL 35203-2605
Telephone: (205) 250-7776
Facsimile: (205) 250-7675


Jonathan M. Smith, Esq. (D.C. Bar No. 396578)
Deborah Thompson Eisenberg, Esq.
(Md. Fed. Bar No. 23022)
Monique L. Dixon, Esq. (Md. Fed. Bar No. 25126)
PUBLIC JUSTICE CENTER
500 East Lexington Street
Baltimore, MD 21202
Telephone:  (410) 625-9409

-39-

Facsimile:   (410) 625-9423

Jairus M. Gilden, Esq. (Il. Bar No. 12972)
LAW OFFICE OF KARMEL & GILDEN
221 North LaSalle Street, Suite 1440
Chicago, IL 60601
Telephone: (312) 641-2910
Facsimile: (312) 641-0781

Roger K. Doolittle, Esq.
DOOLITTLE & DOOLITTLE
460 Briarwood Drive, Suite 3060
Jackson, MS 39206-3060
Telephone: (601) 957-9777
Facsimile: (601) 957-9779